ELIHU CHAUNCEY & another *vs.* INHABITANTS OF LEOMINSTER.

Worcester.    October 4, 1898. — January 6, 1899.

Present: FIELD, C. J., KNOWLTON, MORTON, BARKER, & HAMMOND, JJ.

*Specific Performance of Agreement to buy Land — Cloud upon Title — Equity.*

If an agreement is made for the conveyance of land by a good and clear title free from all encumbrances, it is immaterial how the title has devolved in the past, if the deed tendered is sufficient to convey the full fee in the whole land free from encumbrances and from such clouds as in equity bar a decree for specific performance.

Where the title to a portion of land agreed to be conveyed by a good and clear title free from all encumbrances descends from a deceased person upon whose estate administration has not been taken out, and sufficient time has not elapsed to raise a presumption that administration will not yet be granted, this court will not decree specific performance of the agreement; and the mere failure of the defendant to produce evidence that there are debts against the estate is not enough to show that the risk is so small that he should be compelled to assume it.

BILL IN EQUITY, filed March 31, 1897, in the Superior Court, to compel specific performance of an agreement to buy land in Leominster. Hearing before *Hopkins*, J., who reported the case for the determination of this court; such decree to be entered as justice might require. The facts appear in the opinion.

*H. Mayo*, for the defendant.

*E. P. Pierce*, for the plaintiffs.

BARKER, J. The chief difficulties in the decision of this case arise from the loose way in which it has been conducted, and the manner in which it has been reserved for the determination of

the full court. The bill alleges that the defendant by an agreement in writing, dated August 3, 1896, and set out by copy, agreed to buy of the plaintiffs certain land for a sum named; that the plaintiffs have always been ready and have offered to perform the agreement on their part, and have asked the defendant to perform it on its part; and that the defendant has refused. One term of the agreement set out is that the land was to be conveyed within two months from the date of the agreement, and that the defendant should pay the price on the delivery of the deeds if they conveyed a good and clear title to the premises free from all encumbrances. The bill was filed on March 31, 1897. The answer admits the execution of the agreement, states that the defendant denies that the plaintiffs have a good and clear title to the land free from all encumbrances and will require the plaintiffs to prove title, and states further that there are many defects in the record title which can be cured, if at all, only by a resort to parol evidence and a long and difficult investigation of facts; that the title is not a marketable one such as can be sold to a reasonable purchaser or mortgaged to a reasonable mortgagee, and that it would not be equitable to decree specific performance. A supplemental answer alleges that before the filing of the bill the defendant notified the plaintiffs that it would not accept the deeds tendered, and that since the giving of such notice there has been such a change of circumstances as would make a decree for specific performance inequitable; that at the time of the agreement the defendant's high school building was so overcrowded that it was necessary for the defendant at once to provide additional school accommodations either by erecting a new building for its high school, or building additional houses for the lower grades, and remodelling its high school building for the purposes of its high school; that in June, 1896, the town voted to buy the land for a high school building, and in October, 1896, voted to build a new high school building; that after the plaintiffs failed to furnish a satisfactory title to the land the defendant took no further action towards erecting a new high school, and on March 1, 1897, voted to build two new schoolhouses, which it had built before the hearing before the master, and had remodelled its high school building for the purposes of its high school, and no longer desires to build a new high

school building, and has no use for the land. It does not appear when the supplemental answer was filed, but from the reference in it to the hearing before the master it would seem to have been after that hearing. No replication appears to have been made by the plaintiffs to either answer. At some time the case was referred to a special master. The rule to the master is not set out, but it seems from his report, and from the report of the learned justice of the Superior Court, who reserved the case for the determination of the full court, to have been a rule requiring the master to find the facts, although upon the record the parties were not at issue. It appears from the master's report that he heard the parties on October 22, 1897, and that evidence was put in before him. His report was made on March 30, 1898. No exceptions were taken to it by the parties. The report states no questions as questions of law. There is no order affirming the master's report. The report, which reserves the case for the full court, says that the case was heard and so reserved by the court below upon the pleadings and master's report, but adds that at the hearing the defendant admitted there had been no change in the value, quality, or condition of the land, and no laches on the part of the plaintiffs in clearing the title.

Recurring to the bill, it appears from the agreement that the plaintiffs purported to act in making it not only for themselves but as agents of numerous other persons, who with the plaintiffs are named in it, and are described in it as the party of the first part. None of these other persons are parties to the cause. While the plaintiffs agree to sell the land, neither the bill nor the agreement alleges that the plaintiffs themselves had title to the land, and the agreement is that it is to be conveyed by deeds from its owners, for which deeds the defendant is to pay the purchase price upon their delivery, if they convey to the defendant a good and clear title free from all encumbrances. That part of the first answer, therefore, in which the defendant says that it denies that the plaintiff has a good and clear title to the land free from encumbrances, and will require the plaintiffs to prove their title thereto, is not a denial of any allegation made in the bill or necessary to the case stated by the bill. If it is to be treated as an allegation of a fact in defence, the fact is not material under the bill. The answer does not deny the alle-

gations of the bill that the plaintiffs have always been ready and have offered to perform the agreement on their part, and, there is no direct averment by the defendant that the deeds. tendered to it by the plaintiffs did not convey a good and clear title to the land. On the other hand, the plaintiffs have not joined issue on the allegation of the answer that there are many defects in the record title to the land which can only be cured by a resort to parol evidence and a long and difficult investigation of facts, and that the title is not marketable.

From the master's report it appears that the agreement was duly made, and the necessary appropriation made by the defendant to provide for the payment of the purchase money. The land consisted of some seventeen and a quarter acres in three contiguous parcels. On September 29, 1896, the plaintiffs tendered deeds which they asserted were sufficient to convey to the defendant a good and clear title to the whole land. At this time the defendant was not in funds to pay the purchase money, and also desired time to make an examination of the title, and it was then agreed that time should be allowed for this purpose, and that in the mean time the deeds should be left with the chairman of the selectmen.

In November following the defendant notified the plaintiffs of certain defects which it asserted existed in the title. The deeds tendered were, sufficient in form to satisfy the agreement, and the defendant admitted that they were sufficient to convey good title to two of the three lots constituting the land, but asserted that they were not sufficient to convey a good title to the other lot because the title of the grantors to some fractional interests in this lot came through deceased persons of whose estates there is no record of settlement in the Probate Courts. In fact the plaintiffs as trustees owned fifty-four one-hundredths of this lot, and the defendant admitted the sufficiency of that title, and of the deeds tendered to convey it. As to the remaining forty-six one-hundredths of the lot the plaintiffs asserted that the title was in one Nancy Salisbury at the time of her death in 1865. The defendant admitted that the deeds tendered were sufficient to convey all the title which Nancy Salisbury had at her death, but asserted that her title was defective for want of settlement in probate of the estates of six persons, through whom her title

was derived. These persons were: (1) Lucretia Farley, who died in Hollis, New Hampshire, in 1819, owning one thirty-ninth of the lot, and leaving a husband and four children. (2) Lucinda Gardner, who died at Leominster in 1826, owning twelve one-hundredths of the lot, and leaving as her heirs and next of kin eleven brothers and sisters, and the issue of a deceased sister. (3) Francis Gardner, Jr., who died in 1835, owning thirteen one-hundredths, and leaving a widow and five children. (4) Delia L. Gardner, who died at Boston in 1842, owning thirteen five-hundredths, and leaving a mother and four brothers and sisters. (5) Henry G. Seaver, who died at Boston in 1838, owning thirteen four-hundredths, and leaving three brothers and sisters. (6) Mary Whitcomb, who died at Bolton in 1852, owning one one-hundredth, and leaving two children and the issue of a deceased child.

Nancy Salisbury's title to one one-hundredth of this lot was from the heirs of John Gardner, who died August 26, 1856. After the deeds were tendered to the defendant, and after the defendant had objected that Nancy Salisbury's title was defective because the estates of the six persons named had not been settled in the Probate Court, at some time in the same November the parties ascertained that the deed from John Gardner's heirs to Nancy Salisbury contained no habendum, and operated to convey to her an estate for her life only, so that the title to John Gardner's one-hundredth was then in the persons entitled to claim through his heirs. The master's report does not state that any agreement for an extension of time was made by the parties except the previous one made on September 29, 1896, when it was agreed by the parties that time should be allowed for the defendant to make an examination of title, nor does the report state that the subsequent efforts of the plaintiffs to cure the defect in the title which came through John Gardner were made at the request or with the knowledge of the defendant. Nor does the master's report state that upon the discovery that the deed from the heirs of John Gardner had no habendum, and that one one-hundredth of the lot was not conveyed by the deeds tendered to the defendant, the latter considered the bargain off, and would no longer hold itself bound to take and pay for the land, or that it so notified the plaintiffs.

The plaintiffs did, in fact, in January and February, 1897, procure to one of themselves deeds from twenty-eight persons, who were all the persons who had any interest in the land by descent or by will from John Gardner or those taking under him, and in the latter part of February, 1897, the plaintiffs tendered to the defendant an additional deed conveying all the interest so acquired. The master's report does not state whether the deeds tendered on September 26, 1896, still remained in the custody of the chairman of the selectmen. Upon the making of the tender of the last deed in February, 1897, the defendant objected to the title which the deed purported to convey that it came by descent from persons deceased of whose estates there is no record of settlement in the Probate Courts, and that for that reason the title was insufficient.

John Gardner died at Leominster on August 24, 1856, and there is no record of the settlement of his estate in the Probate Court. There was some evidence before the master that he left a will, but the master finds that he died intestate, leaving as his heirs six children and the issue of a deceased child to whom his title passed by descent. Between John Gardner and the grantor in the deed tendered to the defendant in February, 1897, there were instances in which the title to undivided interests in the lot passed by descent from persons of whose estates there is no record of settlement in the Probate Court: (1) Two children of a daughter of John Gardner, who died before him, inherited from him, in 1856, what would have been their mother's share, or one seven-hundredth part of the lot. (2) One of these children, William G. Thurston, died at Cincinnati, Ohio, in 1877, and his fourteen-hundredth part of the lot descended to his two children. (3) William T. Osgood died at Springfield in 1892, owning one eighty-four-hundredth of the lot, which descended to his only child. (4) J. D. C. Thurston died in New York City in 1894, owning one twenty-eight-hundredth of the lot, which descended to his sister.

Besides this, one forty-two-hundredth part of the lot passed by will of John G. White, who died at Cambridge on September 7, 1896, the affidavit of notice of the appointment of his executrix having been filed on December 1, 1897, or some months after the filing of the plaintiffs' bill; and one seven-hundredth part of

the lot passed by will of Francis Gardner of Boston, who died in 1881, and in whose estate in probate the affidavit of notice of appointment was filed on December 10, 1897; but in each of these cases the affidavit filed showed that notice was duly given within three months after the appointment. There was no evidence of any outstanding or unpaid liabilities of any kind against any of the estates of the persons through whom the title came to the plaintiffs. The lot to the title of which the defendant objected was woodland, and no question or claim of title by prescription was raised before the master. It contained seven acres and was worth $7,000. The report also finds in substance the facts alleged in the defendant's supplemental answer as to the purpose for which the defendant voted to purchase the land, and its subsequent action in otherwise providing accommodations for its schools.

Assuming that it is our duty upon the case, as it stands, to decide whether the plaintiffs shall have a decree for specific performance, we think that the bill should be dismissed, with costs. Aside from the contention that the last deed was not seasonably tendered, and which we do not consider, most of the defendant's objections are clearly untenable. The agreement did not call for a title every step in which should appear of record. The agreement was for a good and clear title free from all encumbrances, and it was immaterial how the title had devolved in the past if the deeds tendered were sufficient to convey to the defendant the full fee in the whole land free from encumbrances, and free from such clouds as in equity bar a decree for specific performance.

Under our decisions, where the only defence is want of good title, equity will decree specific performance when the title tendered is beyond reasonable doubt, although there are questions in respect to the title which must depend upon circumstantial evidence, and although there may be still the possibility of a defect, and a remote chance that the title may be exposed to litigation and finally held to be imperfect. *Hayes* v. *Harmony Grove Cemetery*, 108 Mass. 400, and cases cited. *First African Methodist Episcopal Society* v. *Brown*, 147 Mass. 296, 298. *Cushing* v. *Spalding*, 164 Mass. 287. *Loring* v. *Whitney*, 167 Mass. 550. *Conley* v. *Finn*, 171 Mass. 70.

In most of the instances in which the title tendered came through persons whose estates had not been settled in the Probate Courts more than twenty years have now elapsed since the devolution of title by descent, and there was no evidence of the existence of claims of any kind against the estates of the persons from whom the title descended. In the two instances in which small interests in a part of the land passed under comparatively recent wills, the wills were duly probated, and the notices which found the bar of the short statute of limitations were duly given, although the affidavits of the giving of such notice were not filed until after the filing of the bill. There were, however, two instances in which title to a very small interest in a part of the land passed quite recently from persons whose estates have not been brought into the Probate Court for settlement. These were the descent of one eighty-four-hundredth of the seven-acre lot from William T. Osgood to his only child in 1892, and the descent of one twenty-eight-hundredth of the same lot from J. D. C. Thurston to his sister in 1894. The plaintiffs contend that these interests are so minute that the possibility that the title which passed to the heir will be charged with the debts of the ancestor is of no consequence here. We think otherwise. Every tenant in common is seised of the whole land, and may enter upon and use it without committing a trespass. It was the purpose of the defendant in acquiring the land to use it for school purposes, which would make it necessary that the defendant should have the exclusive right of occupation. If the defendant should be compelled to accept the title, it would, as a municipal corporation, be expected to use the land for some public purpose which would require the exclusive right of occupancy. In adverting to this, we do not intimate that we should require any purchaser to accept a deed which failed to convey to him a minute undivided interest when he had bargained for the whole fee.

The title to the share of the seven-acre lot which descended in 1892 from Osgood to his son, and of the share which descended in 1894 from Thurston to his sister, are both subject to a cloud, in that they may yet be taken for the debts of the decedents respectively. While there was no evidence before the master that there were any such debts, there has been no

administration taken out as yet upon the estates, and sufficient time has not elapsed to raise a presumption that administration will not yet be granted. Without administration and the giving of the notice of appointment to show that if there are any claims they must be presently extinguished by the statute of limitations, we think that the mere failure of the defendant to produce before the master evidence that there are such debts is not enough to show that the risk is so small that the defendant should be compelled to assume it.

*Bill dismissed, with costs.*